IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Robert Antonio Washington, ) | Civil Action No. 6:16-3392-PMD-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Nancy A. Berryhill, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1] The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits and disabled adult child's benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff applications for disability insurance benefits ("DIB") and disabled adult child benefits ("DAC")[2] on March 20, 2014. The claims were denied initially and on reconsideration. The plaintiff also filed an application for supplemental security income ("SSI") benefits and was found to be disabled as of the filing date of March 3, 2014 (Tr. 12).

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

[2] An adult disabled before age 22 may be eligible for child's benefits if a parent is deceased or starts receiving retirement of disability benefits. The agency considers this a child's benefit because it is paid on a parent's Social Security earnings record. *See* 20 C.F.R. § 404.350.

His alleged onset date of disability is January 1992 (Tr. 67, 74). The plaintiff's date last insured for purposes of DIB was June 30, 2004 (Tr. 121). On July 30, 2014, the plaintiff requested a hearing on his DIB and DAC claims. The administrative law judge ("ALJ"), before whom the plaintiff appeared at a hearing on February 19, 2015, considered the case *de novo* and, on April 23, 2015, issued a decision finding that the plaintiff was not under a disability as defined in the Social Security Act, as amended (Tr. 12-19). The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on August 10, 2016 (Tr. 5-7). The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1) Born on October 2, 1981, the claimant had not attained age 22 as of January 1, 1992, the alleged onset date (20 C.F.R. §§ 404.102 and 404.350(a)(5)).
>
> (2) The claimant has not engaged in substantial gainful activity since January 1, 1992, the alleged onset date (20 C.F.R. § 404.1571 *et seq*.).
>
> (3) Prior to attaining age 22, the claimant has the following severe combination of impairments: borderline intellectual functioning and substance abuse (20 C.F.R. § 404.1520(c)).
>
> (4) Prior to attaining age 22, and prior to the date last insured, the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).
>
> (5) After careful consideration of the entire record, I find that, prior to attaining age 22, and prior to the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except he is limited to understanding, remembering, and carrying out simple instructions in jobs with no ongoing public interaction.

2

(6) The claimant has no past relevant work (20 C.F.R. § 404.1565).

(7) The claimant was born on October 2, 1981, and was 10 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. § 404.1563).

(8) The claimant has a limited education and is able to communicate in English (20 C.F.R. § 404.1564).

(9) Transferability of job skills is not an issue because the claimant does not have past relevant work (20 C.F.R. § 404.1568).

(10) Prior to attaining age 22, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform (20 C.F.R. § 404.1569 and 404.1569(a)).

(11) The claimant was not under a disability, as defined in the Social Security Act, at any time prior to October 1, 2003, the date he attained age 22, on June 30, 2004, the date last insured (20 C.F.R. §§ 404.350(a)(5) and 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## **APPLICABLE LAW**

Under 42 U.S.C. § 423(d)(1)(A), (d)(5), as well as pursuant to the regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of

3

five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that meets or medically equals an impairment contained in the Listing of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1, (4) can perform his past relevant work, and (5) can perform other work. *Id.* § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A claimant must make a *prima facie* case of disability by showing he is unable to return to his past relevant work because of his impairments. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). Once an individual has established a *prima facie* case of disability, the burden shifts to the Commissioner to establish that the plaintiff can perform alternative work and that such work exists in the national economy. *Id.* (citing 42 U.S.C. § 423(d)(2)(A)). The Commissioner may carry this burden by obtaining testimony from a vocational expert. *Id.* at 192.

Pursuant to 42 U.S.C. § 405(g), the court may review the Commissioner's denial of benefits. However, this review is limited to considering whether the Commissioner's findings "are supported by substantial evidence and were reached through application of the correct legal standard." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* In reviewing the evidence, the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Id*. Consequently, even if the court disagrees with Commissioner's decision, the court must uphold it if it supported by substantial evidence. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was born on October 2, 1981, and was ten years old on his alleged disability onset date (January 1, 1992) and 22 years old on his date last insured for DIB purposes (June 30, 2004). At the time of the administrative hearing (February 19, 2015), the plaintiff was 33 years old. He completed the tenth grade in special education classes and has no past relevant work (Tr. 310).

On July 1, 1994, when the plaintiff was 12 years old, he underwent a psychological re-evaluation with the Charleston County School District. He was in a self-contained Educable Mentally Disabled classroom. He was administered the Wechsler Intelligence Scale for Children - Third Edition (WISC-III) and obtained a Verbal IQ of 67, Performance IQ of 70, and Full Scale IQ of 66. The plaintiff's attention span was adequate (Tr. 202-206).

From October 16 to October 30, 1997, the plaintiff was admitted to the William S. Hall Psychiatric Institute. He was admitted from the Department of Juvenile Justice ("DJJ") with a chief complaint of hearing voices telling him to do bad things. He reported depression and voices telling him to harm others. The plaintiff had been incarcerated since December 1996. He was 16 years old at the time of his admission at William S. Hall. It was noted that the plaintiff had been hospitalized at the Medical University of South Carolina ("MUSC") several years before and assessed with oppositional defiant disorder and "mild mental retardation." The plaintiff was on Effexor and Risperdal at the time of his admission. The plaintiff was considered to have borderline intellectual functioning. He was started on Sertaline and Olanzapine and experienced no side effects other than morning drowsiness. The plaintiff was released back to DJJ with the recommendation that he be seen by a psychiatrist within a week. Diagnoses included major depressive disorder with psychotic features, conduct disorder, borderline intellectual functioning, and a Global

5

Assessment of Functioning ("GAF") of 40 on admission, improved to 70 at discharge (Tr. 279-82).[3]

The plaintiff was admitted to William S. Hall again from February 20 to March 12, 1998. He was again referred for complaints of depression. The plaintiff stabilized and improved with treatment, with a GAF of 60 on discharge. Diagnoses included conduct disorder, major depression with psychotic features, and mild mental retardation (Tr. 294).

On February 12, 1999, the plaintiff transferred to New Endeavors. He was eligible for placement in a separate special program (Tr. 200). By March 1999, records indicate the plaintiff had been absent for much of the time he was enrolled at New Endeavors. When in class, he fell asleep quite a bit during the day. Reasons for his behavior were social avoidance, escape situation, and avoidance. Events that triggered behavior were instructional demands, fatigue, and off task (Tr. 224).

A Charleston County School District Individualized Education Program ("IEP") review dated March 11, 1999, indicates that the plaintiff had been withdrawn from school following ten consecutive days absent (Tr. 208). It was noted that it was not advisable that he participate in any unstructured, unsupervised activity due to aggression, noncompliance, and verbal aggression. A separate school was recommended due to the need for close supervision, highly structured environment, and the need for counseling (Tr. 219).

---

[3] A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*"). A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.* A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.* A GAF score between 31 and 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *Id.*

On June 30, 2000, the plaintiff was counseled at the South Carolina Department of Vocational Rehabilitation about job keeping skills, obeying rules, and being proactive in job search. It was noted in the department's records that the plaintiff was "Job Ready." Emotional instability was discussed with the plaintiff and his mother. However, he refused to attend mental health treatment. In August 2000, the plaintiff continued to refuse mental health treatment. He became angry with his mother during a home visit when she indicated he needed help. The plan was to try to convince him to be assessed at the vocational rehabilitation center. In September 2000, vocational rehabilitation records note that the plaintiff's mother suspected that his drug abuse was responsible for his inability to keep a job. The plaintiff had turned down offers for full time work In November 2000. Vocational rehabilitation notified DJJ about the plaintiff's refusal to cooperate. The records from vocational rehabilitation also note that the plaintiff completed adjustment classes successfully, passed the post-test, and participated in the classes (Tr. 119-120).

On November 22, 2005, Roy A. Howell, M.D., evaluated the plaintiff in a consultative examination for back pain. After examination, Dr. Howell's impression was chronic back with history of remote injury, possibly posttraumatic arthritis, and recent history of hematuria, apparently secondary to trauma with residual symptoms suggesting the possibility of some bladder neck obstruction or urethral stricture. Dr. Howell noted that the plaintiff had back pain that was only intermittently bothersome consisting of rather severe back spasm. He had no evaluation or treatment for this problem. Dr. Howell noted it was possible that he would have difficulty doing work that would require heavy lifting over 20 pounds in a repetitive manner. On examination, the plaintiff was noted as cooperative (Tr. 194-97).

On November 30, 2005, Gene Sausser, Ph. D., evaluated the plaintiff in a consultative psychological evaluation. When asked what problems he was experiencing, the plaintiff told Dr. Sausser that he had back spasms and problems with his feet cracking

7

and bleeding. The plaintiff had attended school through the tenth grade and was in special education classes. He reported he was currently on no medications and had never suffered any serious illness. He had been hospitalized one night after being hit by a car while on a bicycle. He had been in William S. Hall Psychiatric Institute and Charter Hospital in 1999. The plaintiff could only say that he was in boot camp probably as a result of arrest and developed bizarre behaviors. He stated he would put a flag around his neck and walk around nude. He described schizophrenic breaks with reality while in boot camp. The plaintiff had a girlfriend with whom he had a three month old baby. The plaintiff was administered the Wechsler Adult Intelligence Scale- Third Edition ("WAIS-III") and obtained a Verbal IQ of 69, Performance IQ of 65, and Full Scale IQ of 65. On the Wide Range Achievement Test– 3, the plaintiff had grade equivalents of second grade reading and spelling and third grade arithmetic. Dr. Sausser noted he did not have access to previous medical and psychiatric records, but he noted that it appeared the plaintiff had a relatively bad psychiatric state for some time but seemed to have come through that fairly well. Dr. Sausser noted the clinical interview failed to document the existence of any current psychological or psychiatric illness. Dr. Sausser further noted that the plaintiff reported that he had not been in trouble for approximately a year, and thus it was possible that the plaintiff's difficulties were due to his peer associations. Dr. Sausser's Axis II impression was mild mental retardation. It was noted that the plaintiff was cooperative (Tr. 188-93).

On December 9, 2005, state agency psychological consultant Mark A. Williams, Ph.D., reviewed the plaintiff's records and completed a psychiatric review technique with regard to Listing 12.05, finding that the plaintiff had "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period" along with a valid verbal, performance, or full scale IQ of 60 through 70. Dr. Williams concluded that the plaintiff did not meet or equal a mental listing because the "evidence does not establish the presence of the 'C' criteria" (Tr. 166-78). Dr.

Williams also completed a mental residual functional capacity ("RFC") assessment. With regard to adaptation, Dr. Williams found that the plaintiff was not significantly limited in his abilities to respond appropriately to changes in a work setting, to be aware of normal hazards and take appropriate precautions, and to travel to unfamiliar places or use transportation, and that he was moderately limited in his ability to set realistic goals or make plans independently of others. The plaintiff could maintain attention and concentration for extended periods and was not significantly limited in the ability to understand, remember, and carry out very short and simple instructions. He was moderately limited in the ability to understand, remember, and carry out detailed instructions. The plaintiff was not significantly limited in his social interaction abilities. Dr. Williams opined that the plaintiff's work demands should be mostly routine (Tr. 163-65).

The plaintiff was admitted to MUSC from March 4 to March 7, 2014, secondary to worsening psychosis and suicidal ideation. The plaintiff reported a long history of auditory and visual hallucinations starting in the mid 1990's. He reported the hallucinations had recently worsened, but he could not identify a trigger. The plaintiff had command auditory hallucinations telling him to harm himself and others. He had intermittent visual hallucinations including "seeing bad things with horns" and "seeing things in shadows." The plaintiff had paranoid thinking that people would harm him. He endorsed suicidal ideation and could not make a safety plan. On mental examination, the plaintiff had fair grooming and hygiene and intermittent eye contact. His mood was angry with constricted affect and suicidal ideation. The plaintiff had not been on medications for many years. He had stopped taking medication about 12 years ago when he struck his infant daughter. The plaintiff thought the medication was making him aggressive. It was unclear what prompted him to seek treatment now other than his reported worsening symptoms. The plaintiff was started on Risperdal with resolution of hallucinations. He was diagnosed

with psychosis not otherwise specified, cannabis use disorder, cocaine use disorder, nicotine use disorder, and alcohol use disorder (Tr. 229-32).

During the administrative hearing on February 19, 2015, the plaintiff explained that he needed help staying on top of tasks in school. He left school in the tenth grade because his father died and he had "a little difficulties." The plaintiff was hospitalized around that time for suicidal thoughts. The plaintiff endorsed having depression his whole life (Tr. 312-14).

The plaintiff stated that he saw things sometimes and preferred to stay by himself most of the time (Tr. 313). The plaintiff had "not really" ever worked successfully. He had difficulty comprehending the things he was asked to do. He had only worked about a month at a time because of "same old suicidal thoughts and all that. So – I can't deal too much with crowds" (Tr. 317). The plaintiff also complained of lower back pain and "heart pains" sometimes (Tr 315). He stated that he had always lived with his mother. He relied on her for all of the housework and shopping (Tr. 320).

## **ANALYSIS**

The plaintiff argues that the ALJ erred by (1) failing to consider Listing 12.05C (Intellectual Disability) and (2) failing to make a "Paragraph B" analysis that is based on substantial evidence.

### *Listing 12.05C*

The plaintiff first argues that the ALJ erred in failing to consider Listing 12.05C at step three of the sequential evaluation process (doc. 13 at 6-10). The regulations state that upon a showing of a listed impairment of sufficient duration, "we will find you disabled without considering your age, education, and work experience." 20 C.F.R. § 404.1520(d). A listing analysis includes identifying the relevant listed impairments and comparing the criteria with the evidence of the plaintiff's symptoms. *Cook v. Heckler*, 783 F.2d 1168, 1173

(4th Cir. 1986) (stating that "[w]ithout such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination").

> At the time of the ALJ's decision, Listing 12.05 provided, in pertinent part:
>
> *Intellectual Disability*: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> \*\*\*
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
> \*\*\*

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05C (Jan. 2015).[4]

As set forth above, to meet the diagnostic description or "capsule definition" of intellectual disability, an individual must have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period [i.e., onset before age 22]." *Id.* This has been described by the Fourth Circuit Court of Appeals as "Prong 1" of Listing 12.05. *See Hancock v. Astrue*, 667 F.3d 470, 473 (4th Cir. 2012). "Deficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and

---

[4] Listing 12.05C was amended as of January 17, 2017, pursuant to the final rule on Revised Medical Criteria for Evaluating Mental Disorders, in which the Social Security Administration states, "We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions. If a court reverses our final decision and remands a case for further administrative proceedings after the effective date of these final rules, we will apply these final rules to the entire period at issue in the decision we make after the court's remand." 81 Fed. Reg. 66138, 2016 WL 5341732 (Sept. 26, 2016).

safety." *Jackson v. Astrue*, 467 F. App'x 214, 218 (4th Cir. 2012) (citing *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002)). "If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria [paragraphs A through D], we will find that [the] impairment meets the listing." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A) (Jan. 2015). "At issue in this case was Requirement C, which requires '[a] valid verbal, performance, or full scale IQ of 60 through 70' ("Prong 2"), as well as 'a physical or other mental impairment imposing an additional and significant work-related limitation of function' ('Prong 3')." *Hancock*, 667 F.3d at 473. The regulations provide that "[s]ince the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(D)(6)(a) (Jan. 2015).

At step three of the sequential evaluation process, the ALJ in this case specifically mentioned Listings 12.02 (Organic Mental Disorders) and 12.09 (Substance Addiction Disorders), considered whether the "Paragraph B" criteria of the mental health listings were satisfied, and found that the plaintiff "did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments . . . ." (Tr. 15-16). The ALJ did not mention Listing 12.05 in the step three analysis.[5]

The Commissioner argues that the ALJ's failure to specifically mention Listing 12.05 is not reversible error because the ALJ included a discussion of the elements of Listing 12.05 without mentioning the particular listing elsewhere in the decision (doc. 14 at 8). Specifically, in the RFC assessment, the ALJ found as follows, in pertinent part:

---

[5] The plaintiff specifically alleged in the pre-hearing brief that his impairments met Listing 12.05C (Tr. 148).

12

> Some testing revealed IQ scores in the 60s, but other evaluations indicate borderline intellectual functioning. However, the evidence does not support a finding that the claimant demonstrates deficiencies in adaptive functioning due to intellectual disability. He has, at times, been employed. Notes from South Carolina Vocational Rehabilitation indicate that the claimant's mother suspected that drug abuse was responsible for the claimant's inability to keep a job. The claimant turned down offers for full time work. In November 2000[,] the Department of Vocational Rehabilitation notified the Department of Juvenile Justice of the claimant's refusal to cooperate (Exhibit 6E).
>
> I also note that the evidence indicates that the claimant has a girlfriend and three children. During a March 2014 hospitalization[,] it was reported that he was able to interact appropriately with peers and staff. Discharge diagnoses included psychosis, NOS, cannabis use disorder, cocaine use disorder, nicotine use disorder, and alcohol use disorder (Exhibit 9F).
>
> In sum, I find that the evidence does not support a finding of disability . . . prior to the date last insured of June 2004. While the evidence reveals that the claimant has low IQ scores, it also shows a history of legal problems, incarceration, noncompliance with treatment, absence from school, and substance abuse.

(Tr. 17).

As to Prong 1 of Listing 12.05C, the plaintiff argues that "the ALJ briefly mentioned deficits in adaptive functioning, but only observed that [he] had worked, 'at times,' that substance abuse contributed to his inability to maintain employment, and that he had a girlfriend and children. This brief discussion does not discharge the ALJ's duty to do a full Listing analysis, and does not acknowledge a great deal of contrary evidence . . . " (doc. 13 at 8-9 (citing Tr. 17)). The undersigned agrees. The fact that a claimant "is able to work, raise a family, and otherwise live successfully in the community does not necessarily preclude a finding of mild mental retardation where other deficits in adaptive functioning are present." *Glenn v. Colvin*, C.A. No. 8:13-2099-BHH, 2015 WL 628518, at

*3 (D.S.C. Feb. 12, 2015) (citing *Davis v. Astrue*, C.A. No. 2:07-1621-JFA-RSC, 2008 WL 1826493, at *4 (D.S.C. April 23, 2008)).

As set out above, the ALJ noted the plaintiff's "legal problems, incarceration, noncompliance with treatment, absence from school, and substance abuse" but did not reconcile these issues with his finding that the plaintiff has no deficits in adaptive functioning (Tr. 17). "Without . . . an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination." *Cook*, 783 F.2d at 1173. "Deficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Jackson*, 467 F. App'x at 218 (citation omitted). The ALJ also did not discuss the following evidence in his finding that the plaintiff had no deficits in adaptive functioning: the plaintiff was in special education classes throughout his school career; he was in a self-contained Educable Mentally Disabled classroom; academic achievement testing at age 12 indicated that he was performing reading and spelling at a first and second grade level (Tr. 205); he was often absent from class, and when he was in class, he often fell asleep, which was linked to social avoidance (Tr. 224); problems in school included physical and verbal aggression (Tr. 226); he testified that he had never lived alone (Tr. 315); in a psychological evaluation at age 24, testing indicated that the plaintiff performed reading and spelling at a second grade level (Tr. 191); he had a long history of legal difficulties; and he was hospitalized several times as a teenager for suicidal ideation. In addition, state agency psychological consultant Dr. Williams, whose opinion was given "some weight" by the ALJ (Tr. 18), determined that the

14

plaintiff had "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period" (Tr. 170).[6]

As noted above, at the time of the ALJ's decision, Prong 2 of Listing 12.05C required a valid verbal, performance, or full scale IQ of 60 through 70. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05C (Jan. 2015). The ALJ acknowledged in the RFC assessment that the plaintiff had "some degree of mental deficiency" and that "some testing revealed IQ scores in the 60s," but stated that "other evaluations indicate borderline intellectual functioning" (Tr. 17). The only IQ scores of record are the following: in January 1994, when the plaintiff was 12 years old, he obtained a Verbal IQ of 67, Performance IQ of 70, and Full Scale IQ of 66 (Tr. 202-206); and, in November 2005, when the plaintiff was 24 years old, he obtained a Verbal IQ of 69, Performance IQ of 65, and Full Scale IQ of 65 (Tr. 188-93). It is unclear whether the ALJ accepted these scores as valid. As noted by the plaintiff, the only diagnosis of "borderline intellectual functioning" was made in October 1997 upon the plaintiff's discharge from the William S. Hall Psychiatric Institute where he was treated for major depressive disorder with psychotic features (Tr. 279-82). No IQ scores or explanation accompanied that diagnosis.

At the time of the ALJ's decsion, Prong 3 of Listing 12.05C required "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05C (Jan. 2015). The ALJ did not discuss this prong, but at step two of the sequential evaluation process, he

---

[6] As set forth above, Dr. Williams further found that the plaintiff had a valid verbal, performance, or full scale IQ of 60 through 70, but he ultimately concluded that the plaintiff did not meet or equal a mental listing because the "evidence does not establish the presence of the 'C' criteria" (Tr. 166-78). While it is not clear from the record, presumably Dr. Williams concluded that the plaintiff did not have "a physical or other mental impairment imposing an additional and significant work-related limitation of function" as required by Prong 3 of Listing 12.05C.

found that the plaintiff's substance abuse was a severe impairment - in addition to borderline intellectual functioning (Tr. 14).

Based upon the foregoing, the undersigned finds that the ALJ's inadequate explanation of his findings as to Listing 12.05C makes it impossible to tell whether there was substantial evidence to support the determination. *See Cook*, 783 F.2d at 1173. According, remand is appropriate.

***Remaining Allegation of Error***

The court has found sufficient basis to remand this matter based on the ALJ's failure to properly consider Listing 12.05C. The plaintiff further argues that the ALJ's findings as to the "Paragraph B" criteria of the mental listings at step three of the sequential evaluation process were not based on substantial evidence (doc. 13 at 10-11). Should the district court adopt this recommendation, upon remand, the ALJ will be able to reconsider and re-evaluate the evidence as part of the reconsideration. *Hancock v. Barnhart*, 206 F. Supp.2d 757, 763–64 n.3 (W.D. Va. 2002) (on remand, the ALJ's prior decision has no preclusive effect as it is vacated and the new hearing is conducted *de novo*). Accordingly, as part of the overall reconsideration of this claim upon remand, the ALJ should also consider and address this additional allegation of error raised by the plaintiff. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir.2003) (remanding on other grounds and declining to address claimant's additional arguments). The ALJ should also consider the requirements of *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015) in assessing the plaintiff's RFC.[7]

---

[7] At step three, the ALJ found that the plaintiff had mild difficulties in activities of daily living; moderate difficulties in social functioning; and moderate difficulties in concentration, persistence, and pace (Tr. 15). In the RFC assessment, the ALJ limited the plaintiff to "understanding, remembering, and carrying out simple instructions in jobs with no ongoing public interaction" (Tr. 16). In *Mascio*, the Fourth Circuit Court of Appeals held that "an ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work." 780 F.3d at 638.

## **CONCLUSION AND RECOMMENDATION**

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

January 1. 2018
Greenville, South Carolina